IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 1, 2021

FILED

11/04/2021

Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. LOUIS BERNARD WILLIAMS, III

**Appeal from the Circuit Court for Gibson County**
No. 9840        Clayburn Peeples, Judge

_____

**No. W2020-00281-CCA-R3-CD**

_____

The Defendant, Louis Bernard Williams, III, was convicted of felony evidence tampering, a Class C felony, and three respective counts of simple possession of marijuana, cocaine, and hydrocodone, Class A misdemeanors. See Tenn. Code Ann. §§ 39-16-503, -17-408, -17-415, -17-418. On appeal, the pro se Defendant contends that (1) his residence was improperly searched because the search warrant listed the incorrect address; (2) the evidence obtained in that search should be retroactively suppressed because the Defendant was not convicted of the offense alleged in the search warrant; (3) the evidence should have been suppressed because the confidential informant referenced in the search warrant affidavit was not identified and did not testify at trial; and (4) the trial court should have recused itself due to showing bias against the Defendant by denying his motion to suppress and the court's imposition of an incorrect release eligibility in two previous cases. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Louis Bernard Williams, III, Pikeville, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; and Danny H. Goodman, Jr., District Attorney General pro tem, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

This case arises from an October 15, 2015 search of the Defendant's trailer pursuant to a search warrant, which was obtained after a confidential informant (CI) told officers that the Defendant was selling drugs. As the officers entered the home, the Defendant attempted unsuccessfully to flush two bags of cocaine down the toilet, and officers retrieved the cocaine along with hydrocodone pills and marijuana. The Defendant maintained throughout this case that the drugs were for his personal use and that he did not sell drugs.

The May 2016 term of the Gibson County grand jury indicted the Defendant on two counts of possession of 0.5 grams or more of a Schedule II controlled substance with the intent to manufacture, sell, or deliver, evidence tampering related to the cocaine, and simple possession of marijuana. During the pendency of the proceedings, three attorneys were appointed to the Defendant's case. The first attorney withdrew after obtaining employment with the State. The Defendant's second attorney withdrew on September 4, 2018, after an incident during a jail visit in which the Defendant became combative, had to be restrained, cursed at the attorney, and threatened him. Before the Defendant's third attorney withdrew, he filed an October 10, 2018 motion to suppress based upon the wrong house number being listed in the search warrant affidavit. In addition, on February 20, 2018, District Attorney General Garry Brown petitioned to recuse himself, after which the trial court appointed General Danny Goodman as District Attorney General pro tem.[1] The Defendant chose to represent himself at trial against the strong urging of the trial court.

At trial, Humboldt Police Lieutenant Kenny Rich testified that he had worked for the West Tennessee Drug Task Force as an agent for five years and that his department handled two to three hundred drug cases per year. On October 15, 2015, he executed a search warrant at the Defendant's trailer. Agent Rich stated that he performed surveillance on the trailer for "a number of days" prior to the search and that he saw the Defendant there. Agent Rich affirmed that he verified the Defendant's residency at the trailer and that he attached photographs of the trailer to the search warrant affidavit. Agent Rich noted that a woman named Luna Cox was also observed coming to and leaving the trailer.

---

[1] During a trial recess, remarks by the parties indicated that General Brown previously represented the Defendant in an unrelated case.

–2–

Agent Rich testified that the Defendant lived on North Third Avenue in Humboldt, a "very short street" with a "dead end" on both sides. He determined that the Humboldt Special Response Team, which Agent Rich described as a "SWAT" team, was needed to execute the warrant. The SWAT team consisted of seven or eight officers, and Agent Rich's unit had six agents. He stated that a pickup truck, a marked police vehicle, and two undercover police cruisers arrived at the Defendant's trailer without activating their blue lights or sirens. Agent Rich noted that the trailer sat perpendicular to the street.

Agent Rich testified that as he passed the trailer, he saw the Defendant standing on the front porch. Agent Rich began to yell, "Search Warrant," and the Defendant "took off running" inside. Agent Rich noted that he yelled loudly to inform anyone nearby that "police [were] coming with a search warrant" because entering a residence was dangerous due to the potential presence of firearms. He stated that he and the other officers wore blue or green uniforms with red vests identifying them as police. When Agent Rich entered the trailer, he found the Defendant and Ms. Cox in bed. Agent Rich heard a toilet running, and in the bathroom he saw two plastic bags "swirling" in the toilet bowl. Agent Rich stated that the bags contained powder and crack cocaine, respectively, and that he reached into the toilet bowl to retrieve them. The bag containing crack cocaine had come open in the toilet, and Agent Rich identified a photograph of a white substance remaining in the toilet bowl after the bags' removal.

Agent Rich testified that he retrieved "some of" the crack cocaine, that he did not know how much cocaine "went down the toilet," and that had he not intervened, more evidence would have been lost. A field test of the drugs indicated that the bags contained five grams of crack cocaine and six grams of powder cocaine, which had a combined "street value" of about $1,100.

Agent Rich testified that when he used CIs to conduct undercover drug purchases, the CI typically bought drugs valued at between $50 and $100, which equated to less than one gram. Agent Rich opined that if a person bought $1,100 worth of a drug, the person was reselling it rather than using it.

Agent Rich testified that the search of the Defendant's trailer also uncovered cash in a television stand, "scattered throughout" the house, in the Defendant's wallet, and in a safe. The cash was mostly in denominations smaller than twenty dollars. Agent Rich identified a photograph of a lighter, "some type of case," and "some type of rock," which he noted resembled crack cocaine. The officers also found a bag containing one-half of one gram of marijuana, ten hydrocodone pills wrapped in a receipt, and .22-caliber ammunition. Agent Rich noted that they found no prescription medication bottles in the trailer, although he later identified a photograph of a prescription bottle for an unspecified

–3–

medication. The photograph also included two watches and razor blades containing a white residue; Agent Rich stated that razor blades were commonly used to cut up crack cocaine.

Agent Rich identified more photographs from the Defendant's trailer depicting leaf blowers, saws, drills, and a large quantity of shoe boxes. Agent Rich noted that drug buyers commonly bartered for drugs with such items. He stated that the Defendant's yard contained four cars and a motorcycle. According to Agent Rich, the Defendant stated that he previously had a "factory job" and that he was currently unemployed. The Defendant relayed that he purchased and sold the items in the house as well as the cars. The Defendant also had a police scanner in the home. Agent Rich stated that some individuals owned police scanners because they were involved in illegal activity and wanted to know if the police were coming, although other individuals might own one to monitor activity in their neighborhood. Agent Rich noted that if the Defendant heard the officers' communicating on the police scanner prior to executing the warrant, he would have known the officers were coming. Agent Rich said, though, that they generally did not communicate with one another until just before arriving at the location to be searched. The Defendant also had a hand-held monitor for a camera that recorded the driveway and the cars in the yard in real time. The monitor and cameras were turned on at the time of the search, and Agent Rich stated that the Defendant could have seen the officers approaching the trailer on the monitor. The Defendant also had cell phones and "walkie talkies."

Agent Rich testified that after he gave the Defendant <u>Miranda</u> warnings, the Defendant told him that the cocaine belonged to him and that Ms. Cox knew nothing about it. According to Agent Rich, the Defendant later acknowledged in a police interview that the marijuana and hydrocodone were also his. Agent Rich did not recall finding digital scales at the trailer.

On cross-examination, Agent Rich testified that a CI claimed to have seen the Defendant sell drugs out of his home and car; he acknowledged, however, that the CI did not personally buy any drugs from the Defendant. Agent Rich agreed that he "check[ed] the tags" on the Defendant's cars, and he noted that people commonly "swap[ped]" license plates between different vehicles. He did not recall whether two of the vehicles were registered to the Defendant or whether a third vehicle was registered to the Defendant's daughter.

When asked why the police did not collect the "[t]housands of dollars' worth" of shoes and clothing at the Defendant's trailer, Agent Rich stated that possessing shoes was not illegal and that he generally did not seize someone's shoes and clothing. Agent Rich

said that in order to use crack cocaine, a person had to use a pipe and that no pipe was found inside the Defendant's trailer. Agent Rich acknowledged the prescription medication bottle photographed in the house and stated his belief that it did not correspond to a hydrocodone prescription. He noted that he would not have charged the Defendant if he had a hydrocodone prescription.

Agent Rich testified that the Defendant lived at 619 North Third Street and that the search warrant referred to 319 North Third Street. He explained that he "had a mix-up on the numbers" but that the property description was correct, and he noted the photographs of the trailer he attached to the search warrant affidavit. Agent Rich further explained that 319 North Third Street did not exist. Agent Rich reiterated that he took the photographs, performed the surveillance, and obtained and served the search warrant.

The Defendant asked Agent Rich several questions about the property description indicating that the Defendant believed the description to be incorrect. Agent Rich did not recall the language he used in the search warrant affidavit. The State objected, arguing that the trial court had already ruled upon the suppression motion, and the trial court sustained the objection. The court instructed the Defendant that he would have an opportunity to argue the issue later and said, "[W]hat you're doing is you're asking him questions about the probable cause or the basis for the search warrant. The [c]ourt has already ruled that the search warrant was good. You need to ask him questions about the testimony regarding what he found[.]"

Agent Rich testified that the Defendant told him that he believed he had cancer and HIV and that he used drugs. Agent Rich denied ever thinking that the Defendant merely used drugs and did not sell them. He elaborated that no cocaine user had $1,100 worth of cocaine in his home, and Agent Rich reiterated that no cocaine pipes or crushed cans were found at the trailer. Agent Rich denied ever encountering people who bought large quantities of a drug and "stay[ed] in and d[id] their drugs." Agent Rich stated that upon entering the Defendant's bedroom, he saw the Defendant in bed and immediately went into the bathroom; he denied talking to the Defendant and later walking into the bathroom to check the toilet.

Agent Rich testified that as he approached the trailer in the pickup truck, he made eye contact with the Defendant before the Defendant ran inside. When the Defendant referenced previous occasions during which he met Agent Rich in Agent Rich's truck, Agent Rich stated that when he served the search warrant, he rode in a different pickup truck.

When asked where the CI was, Agent Rich responded that CIs did not have to testify at trial and that they only provided information to create probable cause for search warrants. The Defendant indicated his belief that the CI did not exist. The trial court interjected that it had already ruled on this issue, that anonymous CIs could be used so long as they established their reliability to law enforcement, and that the Defendant had no right to learn the identity of a CI. The court noted that the CI did not provide the police with any proof and that the State's evidence consisted of what the police found during the search. The Defendant protested that "the proof [was] probable cause." He stated that he was seeking to establish that the judge who issued the search warrant was the same one "that dismissed this case." The trial court stated that the Defendant could raise the issue on appeal if he was convicted.

Agent Rich testified that the cash at the Defendant's trailer totaled about $800 and consisted of multiple denominations. He agreed that the cash contained "a lot of ones." Agent Rich stated that he found thirty dollars in a stove on the Defendant's porch. He added that an average drug user bought between fifteen and thirty dollars' worth of a drug at a time and that cash in increments of "fives, tens, and twenties" would be used in the transaction. Agent Rich did not remember the range of sizes for the shoes in the trailer or whether the shoe boxes were "stacked up to the ceiling" inside the trailer. He did not recall whether the officers took the shoes out of their boxes and "poured" them onto the floor in a pile, although he acknowledged the possibility that the officers looked through the boxes to ensure they did not contain drugs. The Defendant indicated that the license plate on his daughter's car contained different tags than the one noted in the search warrant; Agent Rich reiterated that people switched license plates between vehicles often. Agent Rich stated that crack cocaine sellers knew the size of rocks such that scales were not always necessary. He acknowledged that the only proof of an intent to sell the cocaine was the quantity of drugs in the house and there being two types of cocaine there. The Defendant interjected that he used $1,000 worth of cocaine in three days. Agent Rich stated that it was also common for a drug seller to set a pick-up location to avoid face-to-face transactions; in his opinion, the money in the stove on the Defendant's porch was consistent with such an arrangement.

West Tennessee Drug Task Force Deputy Director Johnie Carter testified that he had worked narcotics cases since 2004 and that he had performed undercover drug transactions using CIs. He stated that a CI usually purchased between "a five-dollar rock" and one gram of a drug. Deputy Director Carter had never seen a drug user purchase more than $1,100 worth of drugs, and he noted that a drug user usually did not possess large amounts of drugs or cash. Deputy Director Carter supervised the search of the Defendant's trailer and searched outside the trailer. Deputy Director Carter said that the CI told the police that money for drug purchases was left outside the Defendant's trailer,

sometimes in an old stove.   When Deputy Director Carter opened the stove on the Defendant's front porch, he found thirty dollars.   He opined that the cash was payment for drugs.

On cross-examination, Deputy Director Carter testified that he did not participate in the surveillance in this case.   He was briefed on the investigation and read the search warrant affidavit before it was submitted to a judge.   He stated that the investigating officer identified the residence to be searched as belonging to "Louis Williams."   He noted that it did not matter who owned the property, only who resided there and was the "target" of the search warrant.   Deputy Director Carter acknowledged that he was a supervisor and that part of his job was to verify whose house they were going to enter.

TBI Special Agent Rachel Strandquist, an expert in controlled substance analysis and identification, testified that she analyzed the substances collected at the Defendant's trailer and identified them as follows:   4.22 grams cocaine base,[2] referring to crack cocaine; 0.58 gram marijuana; and 9 hydrocodone tablets.

During a recess, the Defendant asked to recall Agent Rich as a witness.   Upon questioning by the trial court, the Defendant stated that he wished to question Agent Rich about the investigation he undertook to confirm the trailer's ownership, including requesting utility statements.   The State objected, arguing that this issue related to the motion to suppress, which had been heard and denied before trial.   The Defendant continued, arguing that Agent Rich's investigation referred to "Louis [Williams], Jr.," the Defendant's father, instead of the Defendant.   The trial court remarked that it did not matter who the police investigated, but rather the "proof they found."   The court stated that it would allow the Defendant to recall Agent Rich but that it would not allow the Defendant to "argue with him[.]"   The Defendant replied, "Well, it's like . . . it's being biased toward what can be said and what can't be said.   I mean it's hard to prove a case when there [are] only certain things you can say."   The trial court responded, "Mr. Williams, I literally begged you to let me appoint a lawyer for you."   The Defendant stated that his appointed attorneys wanted him to plead guilty to offenses he did not commit.

The trial court told the Defendant that it saw no legal problems with the trial, that if the Defendant was convicted, he faced a sentence of at least twelve to twenty years, and that the Defendant had "a rape case to consider in addition to that."   The Defendant reiterated that he offered the State a three-year plea agreement at thirty percent service and that the State offered an agreement for ten years, thereby "forcing" the Defendant to go to

---

[2] Special Agent Strandquist noted that although the bag contained two "rocklike" substances, she did not test the second rock because it would not "bump [the amount] over [to] the next penalty."   The second rock weighed 11.44 grams, including packaging.

trial.   The Defendant remarked that he had already served thirty percent of ten years.   The trial court stated that it would not argue with the Defendant about the fairness of the plea offer and that it only sought to determine whether the Defendant "understood how much danger [he was] in by this trial."   The court continued, "In spite of the fact that legally I'm supposed to treat people who represent themselves just as if they had F. Lee Bailey talking for them . . . I feel an obligation not to let you do things that are going to be harmful to you."   The Defendant said that the trial court also had a duty not to be biased. The trial court responded, "There's favorable bias and there's unfavorable bias.   Thus far I think the General would say I have been very biased in your favor."   The Defendant stated, "How? Every motion I've put in I haven't had . . . anything done.   I put in a pre-trial motion.   I didn't get it.   You didn't even bring me to [c]ourt."

The trial court proceeded and asked the Defendant if he would call witnesses and whether he would testify.   The Defendant noted that the two witnesses he wanted to call were at work.   The Defendant again protested that he had no pretrial hearing, impliedly on his motion to suppress, and he stated that the trial court committed "judicial misconduct" fifteen years previously by sentencing the Defendant improperly in an unrelated case.   The trial court responded that it did not remember the previous case and that the court had "no ill feeling against" the Defendant.   The Defendant stated that whether he trusted the trial court was "not for [the court] to judge. That's for [the Defendant] to judge[.]"

After a recess, the Defendant lodged an objection based upon his right to confrontation, arguing that the CI did not testify during the State's case and was not subject to cross-examination.   The trial court overruled the objection.

The trial resumed, and the Defendant presented evidence on his behalf.   The Defendant played a recording of his October 15, 2015 police interview.[3] The Defendant stated that during the interview, he told Agent Rich that he had cancer and was using drugs and that he asked the police to test him for the drugs found in his home, but that the police refused to perform such a test.

---

[3] The recording was not entered as a trial exhibit.   The Defendant attached a CD containing photographs and the recording to his appellate brief; however, "documents attached to an appellate brief but not included in the record on appeal cannot be considered by this court as part of the record on appeal." Reginald Tyrone Donnell v. Russell Washburn, Warden, No. M2018-00706-CCA-R3-HC, 2019 WL 2082138, at *2 (Tenn. Crim. App. May 13, 2019) (quoting Grover L. Dunigan v. State, No. E2005-01574-CCA-R3-PC, 2006 WL 433699, at *3 (Tenn. Crim. App. Feb. 23, 2006)); see State v. Matthews, 805 S.W.2d 776, 783-84 (Tenn. Crim. App. 1990) (stating that Tennessee Rule of Appellate Procedure 28 "does not contemplate attaching a transcript of proceedings to a brief when the transcript has not been made a part of the record").

The Defendant also elected to testify. He stated that in the police interview recording, he "barely weighed" one hundred pounds, that he "was facing cancer [and] stressing," and that he did not know if he would die. He said that he "dealt with [his] pain" by using drugs. He stated that he earned money by buying shoes and clothing in Memphis and Mississippi and reselling them.

The Defendant explained that the camera in the broken window in the trailer was meant to gather evidence against the mother of his child, who had previously broken his car's windows. He stated that he reported the vandalism to the police and that they told him no evidence existed that she was the perpetrator.

The Defendant testified that he had "thousands and thousands of dollars['] worth" of clothing and shoes in the trailer, but that the police seized everything "except for what show[ed] how [the Defendant] really made [his] money." He stated that he also sold cars and dogs. The Defendant opined that a difference existed between a cocaine "smoker and a junkie." He explained that a junkie bought small amounts of cocaine, whereas he smoked cocaine because he did not "put his business in the street for everybody to see[.]" The Defendant stated that his cancer "wasn't for the public to know" and that he bought the drugs to "keep [him]self in [his] house and deal with [his] problems." He noted that he lost almost one hundred pounds in two or three months because of stress and that he did not want other people to see "the way [he] was." He stated that he left the home where he lived with his wife and children because he was dealing with his pain in his own way. The Defendant averred that the money in the stove was "for the man to come pick the money up."

The Defendant asked rhetorically why the police had not arranged for a CI to purchase drugs from him. He stated that the police claimed someone had witnessed the Defendant "doing some transactions" in the front yard, but that it was not specified what kind of transaction it was. The Defendant averred that the other person in the yard did not buy drugs from him and that the drugs seized in the house could have been drugs the CI saw the Defendant buy from a third party. He stated that the police assumed he was selling drugs because the CI told them such. The Defendant expressed doubt that the CI existed and stated that he could not "catch [the CI] in a lie" or cross-examine the CI because the CI did not testify at trial. The Defendant opined that the State could not prove he was selling drugs, and he reiterated that he was "using drugs and dying." He noted that the jury could see "every bone in [his] body" on the interview recording.

The Defendant testified that Agent Rich refused to drug test him "because he knew it could be used" at trial; he added that he asked to go to drug rehabilitation and for help with his drug use, but that Agent Rich refused. The Defendant stated that he had gained

weight in jail and was glad to have "got[ten] . . . clean." He said that he would not "let this man make [him] out to be a drug dealer" when he was not. The Defendant reiterated that he was "dealing with something" and told the jury that it could not have "a doubt whatsoever" that he was selling drugs. He averred that Agent Rich had no proof and said, "All he [had was] what he wanted to put together to make it look good."

The Defendant testified that he had made mistakes in the past, including previously selling drugs "years ago" when he first started using them. He stated that after serving time in jail, he stopped selling drugs but continued using drugs to cope with his pain. The Defendant elaborated that his doctor told him that he had a fifty percent chance of surviving surgery, but that it was possible he would die without it. The Defendant referred to his remaining family in the courtroom and stated that all of his family had died "back to back" from the same ailment the Defendant had. The Defendant stated that he would "rather think about the next high than think about the day [he] was fixing to die."

The Defendant testified that if he were selling drugs, the police would have found "thousands and thousands" of dollars' worth of drugs. He stated that he was "not going to sell a small load of [any]thing," as demonstrated by the quantity of shoes and cars he had for sale. The Defendant claimed that the cocaine the police seized was the "limit" he would use in one day and that he would use that amount in three or four hours. He noted, "What I do, I do it to the fullest."

The Defendant testified that his drug use was wrong and that he was willing to accept punishment for it. He averred that he "man[ned] up" to what he did, but that he would not take punishment for selling drugs because he was innocent.

On cross-examination, the Defendant acknowledged that he possessed powder and crack cocaine, hydrocodone, and marijuana. He disagreed with the State that he had more than fifteen grams of cocaine, and he noted that the lab report he received reflected only eleven grams. The Defendant noted that he previously gave the trial court a prescription for the hydrocodone and "[t]hat's how [he] got the charges dismissed."[4] When asked whether he brought the prescription to court, the Defendant responded that he was in jail and that the court already had it. The Defendant acknowledged that he flushed the cocaine down the toilet; when asked why he did it, the Defendant replied, "I'm a smoker. Not a dummy." He elaborated that he did not want the police to know he was smoking drugs,

---

[4] During the proceedings, the Defendant referred multiple times to a charges that were dismissed after a preliminary hearing and re-indicted. The record contains no details regarding those proceedings. At any rate, all four charges in the indictment in this case were presented to the jury.

and he agreed that he was trying to destroy the evidence. However, he then said, "But that's not destroying evidence. That's just getting rid of -- what I was getting rid of was mine." The Defendant denied knowing that the police were coming to his house, and he noted that he lived "in a drug infested area." He stated that when he saw the police driving down the street, he was "paranoid, spooked, and did what [he] thought was best. And that was run and get rid of what [he] had."

The Defendant testified that the camera in the window recorded his front yard and wirelessly transmitted it to a monitor kept by his bed. The Defendant stated that a few months before the police searched his home, he discovered a "big knot" on his neck, and the Defendant's boss advised him to go to the doctor. The doctor biopsied the lump and told the Defendant he had cancer that could be fatal "for where it was at." The doctor prescribed the Defendant hydrocodone, Percocet, and a third unspecified medication. The Defendant underwent surgery on November 18, 2015. He acknowledged that the doctor did not tell him to use cocaine. The Defendant noted that he used cocaine to help his mental state.

The Defendant testified that when he was young, some fifteen years previously, he was convicted of selling marijuana in Madison County and for selling cocaine in Humboldt. He noted that he got "the taste for drugs" after his son died, although he characterized his drug use during the time he sold drugs as "trying it" rather than being a regular user. The Defendant added that a person generally did not use drugs while selling them because the person would deplete his supply.

The Defendant testified that powder and crack cocaine produced different "highs" and that he could use as much as five to six grams of powder cocaine and two to three grams of crack cocaine per day, which was valued at eight or nine hundred dollars. He said, though, that he did not use this much every day. He stated that he made $13,000 per month selling shoes for another person. The Defendant stated that he bought larger amounts of cocaine so that he could stay at home all day and not have to go out multiple times to buy smaller amounts of cocaine. He did not know how much cocaine he bought and used on a daily basis, and he said that he bought what he felt like he needed. He noted that he had children and "a life" and could not "just be junked out 24-7[.]"

After the Defendant's testimony, he entered as exhibits several photographs of Facebook posts he made advertising shoes, clothing, cars, and puppies for sale. He also entered a photograph of a social media post dated November 24, 2015, which showed him in a hospital bed with a stapled incision running along the left side of his neck.

The State recalled Deputy Director Carter in rebuttal, who testified that he was trained as a paramedic and that if a person used the quantity of drugs the Defendant claimed to use, the person "would have a heart attack quick" and could overdose. On cross-examination, Deputy Director Carter stated that he had years of training and experience with drugs as a paramedic and police officer. He acknowledged, though, that he had never personally used drugs.

Upon this evidence, the jury found the Defendant guilty of illegal possession of cocaine, evidence tampering, illegal possession of hydrocodone, and simple possession of marijuana. The Defendant subsequently filed a pro se January 30, 2020 "Motion for Appeal" in the trial court, which raised suppression grounds that had been denied after a pretrial hearing.[5] On February 6, 2020, the Defendant filed a pro se notice of appeal in this court raising the same suppression issues and additional issues related to the Defendant's being re-indicted for evidence tampering, the trial court's losing a copy of the Defendant's prescription for hydrocodone, which he presented at a preliminary hearing, a juror's apologizing to a police witness after the verdict, and the trial court's denying the Defendant a pretrial hearing. On March 2, 2020, this court issued an order noting that the sentencing hearing had not yet occurred and holding the appeal in abeyance.

At the May 28, 2020 sentencing hearing, the trial court discussed with the Defendant that the Defendant's family was trying to hire a lawyer. After arguments regarding the Defendant's prior convictions, the trial court imposed an effective sentence of seven years. The State asked to set a motion for new trial hearing date, and the court asked the Defendant if he understood. The Defendant agreed and stated that he would let the court know by the July 2, 2020 hearing date if his family was unable to hire an attorney. The court recommended strongly that the Defendant hire an attorney or allow it to appoint him one.

On July 6, 2020, this court issued an order noting our receipt of the Defendant's judgment forms and considering the appeal timely filed. At a July 20, 2020 motion hearing, the trial court noted that the court clerk had not received a motion for new trial. The Defendant responded that he and the clerk had a "misunderstanding" and that pertinent to this case, he had filed a notice of appeal regarding his conviction for evidence tampering, not a motion for new trial. The trial court responded that this court had "granted" the appeal, and the trial court added that it would consider the Defendant's "previous request" as an "oral" motion for new trial. The trial court asked if the Defendant had anything he wanted to say about his motion for new trial issues. The Defendant replied, "I never filed a Motion for New Trial. I filed a motion to appeal."

---

[5] The suppression hearing transcript is not included in the record; however, for purposes of this appeal, the trial court's order denying the motion is sufficient for our review.

The trial court briefly explained that the Defendant needed to raise issues in a motion for new trial before raising them on appeal.   The Defendant indicated that he understood, but noted that he "called them [him]self and [he] had a conversation with them and [he] also filed the papers to let them know that there was a conflict of interest[.]"   The court stated that this was one of the issues the Defendant needed to raise in his motion for new trial.   The Defendant responded, "I don't want to file a Motion for New Trial, sir."   The court said, "Well I'm going to treat your complaints as a motion for new trial and I'm going to deny that motion."   The Defendant said, "So you're going to deny a Motion for New Trial that I never filed?"   The court responded affirmatively and reiterated that it would treat "your complaints and your objections" as a motion for new trial.   The Defendant stated that his complaint related to the dismissed and re-indicted evidence tampering charge.   Finally, the Defendant claimed that at some point, he

> called and had a talk with the woman myself and . . . I told her that the [c]ourt was saying that I need to file for a Motion for a New Trial.   She told me, "Well, I don't see why you have to file a Motion for a New Trial to just appeal a charge that you were found guilty of in trial."   She said, "To open a whole new trial, have a new trial, that has nothing to do with trying to appeal something that you had been found guilty for in trial."

When asked by the trial court if he wanted to identify the woman with whom he spoke, the Defendant stated that he did not know her name.   The trial court commented that it was "sure the [c]ourt reviewing this will be interested in that."   Although the prosecutor told the trial court that he would prepare an order denying the motion for new trial, no such order was included in the record.   The appeal is now before us for review.

## ANALYSIS

On appeal, the pro se Defendant contends that (1) his residence was improperly searched because the search warrant listed the incorrect address, the CI was unidentified, and the investigative report referred to Louis Williams, Jr., the Defendant's father; (2) the evidence obtained in that search should be retroactively suppressed because the Defendant was not convicted of the offense alleged in the search warrant; (3) his confrontation rights were violated because the CI did not testify at trial; (4) the trial court should have recused itself due to showing bias against the Defendant by denying his motion to suppress and the court's imposition of an incorrect release eligibility in two previous cases; and (5) the evidence is insufficient to support his conviction for evidence tampering.   The State responds that the Defendant's appeal should be dismissed for failure to conform the appellate brief to the relevant Rules of Appellate Procedure.

–13–

Relative to the State's argument that the Defendant's appeal should be dismissed, this court has traditionally relaxed the Rules of Appellate Procedure in cases involving a pro se defendant. Although the Defendant's multiple handwritten filings are not fashioned in the style of an appellate brief, his issues are readily apparent, and the record is sufficient for us to address them. Accordingly, we may exercise our discretion to consider the Defendant's appeal, notwithstanding the procedural infirmities of his briefs.

However, an issue outside of our discretion exists such that we are limited to considering only the Defendant's sufficiency issue. As the Defendant stated repeatedly at the July 20, 2020 hearing, he filed no motion for a new trial. Even though the trial court attempted to preserve the Defendant's issues for appeal by stating that it considered the Defendant's "previous request" and "objections" as an oral motion for new trial, the court did not specify to which request or objections it referred. At trial, the Defendant made no oral statements about the jury's verdict after it was returned. At the sentencing hearing, the Defendant similarly raised none of the issues contained in his January 30, 2020 "motion to appeal" filed in the trial court or his February 6, 2020 notice of appeal filed in this court.[6] The Defendant only raised issues about the trial in writing, not orally, and we will not comb the record and speculate as to what the trial court referred.

Our rules of criminal procedure provide that "[a] motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). "[T]his thirty day period is jurisdictional and cannot be expanded." State v. Hatcher, 310 S.W.3d 788, 800 (Tenn. 2010). Thus, "[a] trial judge does not have jurisdiction to hear and determine the merits of a motion for a new trial which has not been timely filed." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004).

Unlike other rules of procedure, Rule 33 does not contain a provision for untimely filed motions for new trial. See, e.g., Tenn. R. Crim. P. 32(f) (withdrawal of guilty plea allowed "for any fair and just reason" before sentence is imposed or "to correct manifest injustice" after judgment entered but before it becomes final); Tenn. R. App. P. 4(a) (in criminal cases, "notice of appeal" document is not jurisdictional and filing may be waived "in the interest of justice"). This court does not have the authority to waive the untimely filing of a motion for new trial. State v. Marlin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Stephens, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007); see also Tenn. R. App. P. 4(a).

---

[6] The only substantive issue argued at the sentencing hearing was whether the Defendant's previous convictions, some of which occurred more than ten years previously, could be used to enhance his sentence or establish a higher sentencing range.

In this case, the Defendant did not file a written motion for new trial or orally request one. Nevertheless, the trial court stated that it would retroactively consider the Defendant's unspecified requests and objections as an oral motion for new trial. Putting aside the ambiguity of the trial court's statement, even if an oral motion had been made, it was not reduced to writing within thirty days of the entry of judgments. See Tenn. R. Crim. P. 33(b). We note that the trial court did not instruct the pro se Defendant to prepare a written motion. Because the Defendant did not file a written motion for new trial or reduce an oral request to writing before June 29, 2020,[7] the trial court was without jurisdiction to consider any such motion. See State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Moreover, the record is devoid of any indication that the trial court ever entered a written order denying the supposed oral motion for new trial. As such, we have no findings of fact or conclusions of law upon which to review the trial court's denial of the motion. See Tenn. R. App. P. 36(a) (stating that "relief may not be granted in contravention of the province of the trier of fact").

If a motion for new trial is not filed within the mandatory thirty-day period, all appellate issues are deemed waived except for sufficiency of the evidence and sentencing. Bough, 152 S.W.3d at 460; Martin, 940 S.W.2d.at 569. Only one of the issues raised by the Defendant involves the sufficiency of the evidence.[8] As such, for the purpose of our appellate review, the remainder of the Defendant's issues are waived. See, e.g., State v. Alvina Tinisha Brown, No. E2016-00314-CCA-R3-CD, 2017 WL 2464981, at *4 (Tenn. Crim. App. June 7, 2017). We note that the Defendant makes no argument that this court should review these issues for plain error, and we see no reason to do so sua sponte. The Defendant has waived his issues by failing to raise them in a timely motion for new trial.

I.    Sufficiency

The Defendant contends that the evidence was insufficient to support his evidence tampering conviction, arguing that he did not know a police investigation was ongoing at the time he flushed the cocaine down the toilet. He specifically notes that he was not in

---

[7] We are mindful that the sentencing hearing occurred during a period of the COVID-19 pandemic when our supreme court had issued several orders suspending procedural deadlines; however, the extension only applied to deadlines originally falling between March 13, 2020, and May 31, 2020. Accordingly, the Defendant's deadline to file a motion for new trial expired thirty days after the May 28, 2020 entry of his judgments. Because the thirty-day deadline occurred on a weekend, the last day the Defendant could have filed a motion for new trial was Monday, June 29, 2020. See In re: COVID-19 Pandemic, No. ADM2020-00428 (Tenn. May 26, 2020) (order).

[8] The State's brief includes a general sentencing issue. Our reading of the Defendant's several briefs do not indicate that he clearly raised any issue relative to his sentence.

the police officers' presence during the event. The State responds that the evidence was sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As indicted in this case, the evidence tampering statute provides that it is "unlawful for any person, knowing that an investigation . . . is pending or in progress, to . . . [a]lter, destroy, or conceal any . . . thing with intent to impair its . . . availability as evidence in the investigation or official proceeding." Tenn. Code Ann. § 39-16-503(a)(l).

In the light most favorable to the State, the Defendant testified at trial that he flushed the cocaine down the toilet because he saw the police driving down the street, that he did not want the police to know he was smoking cocaine, and that he was trying to destroy the evidence of his drug use, although he also characterized the act as "getting rid of [what] was [his]." Agent Rich testified that as he passed the trailer with marked police vehicles, including a SWAT team, he saw the Defendant standing on the front porch and made eye contact with him. Agent Rich began to yell that he was executing a search warrant, and the Defendant "took off running" inside. When Agent Rich entered the trailer, he found the Defendant and Ms. Cox in bed, and he heard the toilet in the bathroom running. Agent Rich pulled two bags of cocaine out of the toilet, including one that had opened in the toilet bowl. He did not know how much cocaine was lost during the flushing, but as he documented in the photographs of the toilet, at least some cocaine remained in the toilet bowl. Agent Strandquist noted during her testimony that the quantity of cocaine recovered was relevant to the level of offense charged.

Put simply, the Defendant admitted to knowing an investigation was in process. He saw the police coming down the street and wanted to get rid of his cocaine before they could find it. The Defendant's assertion that the officers had to be in his presence in order for him to know they were conducting an investigation is without any legal basis. See, e.g., State v. Majors, 318 S.W.3d 850, 862-3 (Tenn. 2010) (concluding that the evidence was sufficient to prove evidence tampering when officers entered the defendant's home and yelled, "Search warrant," the defendant ran to the bathroom, and circumstantial evidence indicated that he flushed an item down the toilet, although the officers did not see the act); State v. Logan, 973 S.W.2d 279, 282 (Tenn. Crim. App. 1998) (concluding that the evidence was sufficient to prove evidence tampering when officers knocked on the defendant's door, another person answered the door, the officers yelled, "search warrant," and the defendant was found sitting on a toilet containing multiple baggies of cocaine). The Defendant is not entitled to relief on this basis.


CONCLUSION


In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.


_____
D. KELLY THOMAS, JR., JUDGE


–17–